CRABTREE, Appellant, v. ONDELL, et ux, Respondents.

(235 N. W. 109.)

(File No. 7083.   Opinion filed February 19, 1931.)

*John M. Erwin,* of Redfield, for Appellant.

*L. C. Van Ornum,* of Conde, for Respondent.

BURCH, J. Action for conversion of 14 hogs. The cause of action is pleaded in two counts. While the complaint purports to plead two causes of action, but one recovery is sought, and the so-called causes of action are really but two counts upon one cause of action. Plaintiff's claim is that 14 of his hogs strayed upon the land of defendant. In his first count he alleges that defendant seized and converted the hogs to his own use. In his second count he alleges defendant impounded the hogs for damages and by negligence lost them. Before the verdict was rendered the learned trial judge instructed a verdict for defendant on the second count, leaving for the jury to decide whether or not defendant converted the hogs as alleged in the first count. The jury found for defendant, and judgment was entered accordingly. Plaintiff appeals from the judgment and an order denying his motion for a new trial.

But two questions are presented on appeal, namely, Did the court err in instructing a verdict for defendant on the second count, and, did the court err in denying a new trial on the ground of newly discovered evidence?

We review the evidence to see if there was sufficient to present an issue for the jury under the second count to recover damage for negligence. The evidence was conflicting, and, if there was sufficient evidence in favor of appellant to support a verdict on the count, if believed by the jury, then the issue was for the jury and not for the court to decide.

Appellant has summarized the evidence which he says was sufficient, if believed, to support a verdict on his second count. Such evidence is substantially this: Respondents' cornfield next to their buildings was inclosed with a good hog tight fence, in which respondents' hogs were kept. There was never any trouble with hogs getting out. Respondents knew appellants hogs. On October 10, 1928, appellant lost 14 hogs, and these were seen in the inclosed field. On October 11, and again two days later appellant's hired man and agent demanded the hogs, and they were refused. In reply to one of the demands, Elsie Ondell, respondent, stated they had several of appellant's hogs and were holding two of them for damages. On October 10 she told appellant's wife by phone they had 14 of appellant's hogs. About two weeks later she told Lester Hitchcock, a witness for appellant, that they had 14 of

appellant's hogs and would dispose of them if appellant did not get them. Twelve of the hogs were never returned to appellant, and respondents did not have or know where these 12 hogs were at the time of trial. The foregoing evidence is largely disputed, but for the purpose of testing its sufficiency to support a verdict of negligence must be accepted as true. It will be noticed that respondents claimed they were holding two of the hogs for damage. Appellant put up a bond to release the two, and they were returned to appellant. There is no claim the 12 hogs were held for any lawful purpose, and, if held at all, the unlawful holding constituted conversion, not negligence. One lawfully holding property of another owes a duty to exercise due care, and for failure the perform that duty may be held in damages for negligence. But, where there is no duty to use care, there is no liability for negligence. If the jury found that the 12 hogs were unlawfully held and in some manner disposed of or lost by respondents, they had ample room to protect appellant's rights by returning a verdict for him on the first count. The evidence, however, was conflicting, and we think the court should have submitted the second count for the jury's consideration.

Did the court err in refusing a new trial on the ground of newly discovered evidence? The new evidence is the testimony of Claude Thomas who hauled 15 hogs in his truck to market from respondents' farm, on October 20. Appellant seems to have suspected, and, as far as he was able, he attempted to prove, that respondents sold his hogs, and that the appellant's 12 hogs were among those hauled by Thomas. Before the trial it was known to appellant that Thomas hauled the hogs. Appellant and his counsel both interviewed Thomas before the trial, but Thomas denied that he remembered the description of the hogs he hauled. Appellant's hogs were white, well bred, and a little larger than respondents'. Respondents' hogs were not white, but were mixed, being mostly spotted, some red and one or two white. Thomas now says that he does now and did then remember that the load he hauled consisted of 14 white hogs and 1 red, that he knew the hogs of appellant, and that he believes appellant's hogs were in the load hauled by him. To explain his earlier statements to appellant and his counsel he says he was told by his wife that respondents threatened to prosecute him for hauling the hogs for

pay without a trucker's license if he testified against them, and for that reason, and to keep out of the case as a witness, he purposely misled and deceived appellant. There was considerable testimony concerning those hogs that were hauled to market. An agent of the purchaser who received the hogs at the market testified they were a mixed lot, while another testified he did not remember as they were buying many hogs. There is testimony that appellant's hogs would weigh from 250 to 300 pounds each, and it is admitted by Mrs. Ondell in her testimony for respondents that appellant's hogs were larger than respondents'. The 15 hogs sold averaged 275 pounds each.

It is obvious that the testimony of Thomas, if in appellant's favor, was very material and practically all that appellant could procure concerning the hogs sold. Appellant seems to have been diligent in trying to ascertain the facts that are now disclosed by Thomas, but Thomas refused to disclose them. If respondents were responsible for suppressing this evidence, they ought not to be heard to complain if a new trial is granted where such evidence can be received and weighed by a jury. In counter affidavits respondents do not directly deny making the threat. Mrs. Ondell says she and her husband talked the case over, and she believes her husband would have told her if he intended or thought of having Thomas arrested. Mr. Ondell says he did not know until a few days before the trial there was such a thing as a trucker's license, but he says two days before the trial Miles Smith told him there was talk in the neighborhood of Thomas being arrested for trucking without a license. Then he explains that he never thought of having Thomas arrested, never intimated such a thing. More significant than the failure to directly and specifically deny the accusations of Thomas' affidavit are the elaborate explanations in respondents' counter affidavits. They say they asked Thomas what he would testify to preliminary to using him as a witness, and that he told them the hogs he hauled were mixed colors and not white. In explanation of why they did not then use him, they say Thomas said he would not testify unless subpœnaed, and they did not care to subpœna him. Yet it is common knowledge that a subpœnaed, or even an unwilling, witness who will tell facts in a party's favor, is more valuable and convincing than evidence of a too willing or biased witness. The issue of whose hogs were hauled to market

by Thomas was so vital that it would be natural to force him to tell if it was believed he would testify as he said he would. Respondents knew the facts as well as Thomas did. They do not intimate they doubted his veracity or thought he might not tell the truth. But when Thomas and his wife came into the courtroom during the trial Mrs. Ondell says she went to Mrs. Thomas and asked "Are you down on the trial?" To which Mrs. Thomas replied, "Yes, but Claude is not going to testify for Crabtree, that he might get arrested for trucking without a license." She does not anywhere in her affidavit in any manner intimate any surprise at such an answer. She simply says that was the first intimation she had that there was any talk of arresting Thomas. If it was true that he could not truthfully testify for Crabtree, the first hint that he had considered so testifying would naturally arouse a feeling of outrage and fear more worthy of mention than the rumor that he might be arrested. That there was some concern over Thomas' testimony is indicated by the conversation of the two women, but no reason appears why there should have been unless its suppression was important. Thomas says it was important, so important that he was threatened if he did testify.

We are reluctant to reverse the trial court where the newly discovered evidence consists of the testimony of a person directly connected with the principal fact in issue, who is known by both parties to be an important witness if he will tell what he knows. The circumstances, however, are peculiar. Appellant repeatedly interviewed Thomas and was always assured by the witness that he did not remember the description of the hogs he hauled. Appellant might have placed him on the stand, and there he might have told the truth. But appellant could hardly be expected to do so, without some reasonable expectation of being able to elicit more than such witness promised. We do not think appellant can be accused of lack of diligence. Respondents say the witness promised valuable testimony for them if called. It would seem the natural thing for them to call him, but they did not. They say it was because the witness would not testify unless subpœnaed. He says it was because his testimony would be favorable to appellant, that they knew it, that they did not want him to testify in the case and they threatened to prosecute him if he did, and that that is the reason he misled and deceived appellant to escape being called.

He was present in the courtroom and could have been called without a subpœna. Under all the circumstances we feel that a new trial should be had and the jury permitted to find the facts with this added evidence before them.

In the case of Whitney L. & T. Co. v. Brown, 42 S. D. 95, 172 N. W. 875, this court recognized the right to grant a new trial on the ground of newly discovered evidence, although it was discovered in a witness known to be connected with the facts in issue. In First Inter. Bank v. Davidson, 36 N. D. 1, 161 N. W. 281, evidence newly discovered in a witness present at the trial was allowed as a ground for a new trial. But such results cannot often obtain. It would be extremely difficult to show diligence, unless there was a showing of active fraud in hiding the evidence. We do not say respondents were guilty of active fraud. Appellant charges and makes a showing that they were. Respondents deny the fraud, but in doing so they admit a willful failure to use the best evidence at their command, if, as they claim, Thomas would have corroborated their story that the hogs were a mixed lot, spotted and red. Thomas was the man who hauled them. He appears to have been disinterested, and it is not claimed that his character was such as to render him unworthy of belief. The jury were out a long time and seem to have had difficulty in deciding the case. The evidence describing the hogs marketed is furnished solely by the interested testimony of the respondents and one witness at the market, who was testifying long after receipt of the hogs, who admits the receipt of many hogs delivered by many sellers, and gives no reason for remembering the particular lot in issue. Under such circumstances the neighbor not engaged in general trucking who hauled the hogs, and who, so far as is shown, would naturally know and remember, ought to be heard and his testimony weighed by the jury.

The judgment and order appealed from are therefore reversed.

POLLEY, P. J., and CAMPBELL, ROBERTS, and WARREN, JJ., concur.